**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE LUIS GALLARDO, JUAN CARLOS ALVARADO, and RAFAEL GONZALES, on behalf of themselves, and all other plaintiffs similarly situated, known and unknown, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 12-cv-7202 |
| v. | ) ) | Honorable Amy St. Eve |
| SCOTT BYRON & CO., and SCOTT BYRON, Individually, | ) ) ) ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

AMY J. ST. EVE, District Court Judge:

Plaintiffs Jose Luis Gallardo, Juan Carlos Alvarado, and Rafael Gonzales bring this putative class action against Defendants Scott Byron & Co. ("SBC") and Scott Byron, individually, alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115/1 *et seq.*  (*See* R. 1, Compl. ¶ 1.)  Specifically, Plaintiff Gallardo alleges that Defendants violated the FLSA by failing to compensate him for "off-the-clock" work performed before and after his workday and time spent travelling from SBC's main facility to the first client work site of the day and back to the facility from the last client work site.  Miguel Duran has opted-in to this suit (R. 66, 74) and asserts these same claims.  Plaintiffs Gallardo and Alvarado allege that Defendants violated the FLSA and the IMWL by improperly calculating their overtime pay rate using the "fluctuating workweek"

method of calculation. Additionally, all Plaintiffs claim that these practices also violated the IWPCA.

Before the Court are three motions: (1) Plaintiffs' amended motion to begin notice to potential class members pursuant to Section 16(b) of the FLSA (R. 49, Pls. Mot. for Class Notice); (2) Defendants' motion for partial summary judgment on all claims except Gonzalez's claim for "off-the-clock" work (R. 68, Defs. Mot.); and (3) Defendants' supplemental motion for partial summary judgment on Duran's unpaid travel time claim. (R. 75, Defs. Supp. Mot.) For the following reasons, the Court grants in part and denies in part Plaintiffs' motion to send notice to potential class members. Additionally, the Court grants in part and denies in part Defendants' motions for partial summary judgment.

## BACKGROUND[1]

### I. The Parties

Defendant Scott Byron & Co. ("SBC") provides landscaping and snow removal services to businesses and residents in Chicago and its north and west suburbs as well as parts of Wisconsin and Indiana. (R. 70, Defs. L.R. 56.1 Stmt. ¶ 1.)[2] Plaintiffs Gallardo, Alvarado, and Gonzales and opt-in Plaintiff Duran are former employees of SBC who worked in the Property Improvement Division. (Defs. L.R. 56.1 Stmt. ¶¶ 3-5; Defs. Supp. Mot. ¶ 3.) Employees in the Property Improvement Division performed landscaping services for SBC's clients, including

---

[1] In this section, the Court sets forth the undisputed facts related to Defendants' motions for partial summary judgment. The Court discusses additional facts, where relevant, within its analysis of Plaintiffs' motion to send class notice.

[2] Citations to "Defs. L.R. 56.1 Stmt." refer collectively to Defendants' Local Rule 56.1 Statement of Undisputed Material Facts (R. 70) and Plaintiffs' Local Rule 56.1(b)(3) Response (R. 80). For clarity, the Court will use this citation form only when the fact preceding the citation is undisputed or, if disputed, the dispute is not material to the determination of Defendants' summary judgment motion.

lawn mowing, cutting, and pruning, watering, seasonal planting, and weed whipping.  (Defs. L.R. 56.1 Stmt. ¶ 8.)

SBC organized employees in the Property Improvement Division into crews consisting of one site supervisor and two or three laborers.  (*Id.* ¶ 9.)  The site supervisor was primarily responsible for supervising his or her assigned crew, interacting with the clients, and driving the SBC truck to and from job sites.  (*Id.* ¶ 12.)  The site supervisor also assisted laborers in performing various landscaping services for SBC's clients.  (*Id.* ¶ 13; Pls. Resp. to Defs. L.R. 56.1 Stmt. ¶ 12.)  The same "crew" of employees worked together each day and performed landscaping services for the same set of clients during each week of the landscaping season. (Defs. L.R. 56.1 Stmt. ¶ 9.)  The crew generally serviced three to five clients per day, and performed the same routine landscaping services for each client from week to week.  (*Id.* ¶ 10.)

Gallardo and Alvarado worked for SBC as site supervisors from 2011 to 2012.  (*Id.* ¶ 3.) Gallardo worked for SBC from April 2011 to August 2012, while Alvarado worked there from May 2011 to May 2012.  (*Id.*)  Plaintiff Gonzalez worked for SBC as a seasonal laborer from April 2011 until the end of the landscaping season in the fall of 2011 and again from March 2012 until May 2012.  (*Id.*)  Opt-in Plaintiff Duran worked as a seasonal laborer for SBC as well, but the parties have not identified the timing of his employment with SBC.  (*See* Defs. Supp. Mot. ¶ 3.)

## II.    SBC's Drive Time Policy

SBC's Employee Handbook contained a "Drive Time Policy" that applies to all laborers. (Defs. L.R. 56.1 Stmt. ¶¶ 24-26; R. 70 at Ex. 4, "Drive Time Policy.")  Under the Drive Time Policy, SBC holds laborers responsible for securing reliable transportation to the first client work

site of the day and home from the last site of the day.  (Defs. L.R. 56.1 Stmt. ¶ 25; Drive Time Policy ¶ 3.)  Although laborers need not report to the SBC facility in Lake Bluff, Illinois at the beginning or end of the workday under the policy (Defs. L.R. 56.1 Stmt. ¶¶ 1, 25; Drive Time Policy ¶ 1), SBC offers free transportation (purportedly "as a convenience to its laborers") to the crew's first client work site and from the last site for laborers who choose to report to SBC's Lake Bluff facility at the beginning and end of the day.  (Defs. L.R. 56.1 Stmt. ¶ 26; Drive Time Policy ¶ 4.)  Laborers who report to the SBC facility in the morning may ride to the first client work site as passengers in the SBC truck that the site supervisor drives with the necessary supplies for the day.  (Defs. L.R. 56.1 Stmt. ¶ 26.)

Laborers do not drive the SBC truck, and they do not perform any work while traveling in the SBC truck to the first job site or back from the last job site.  (*Id.* ¶¶ 30, 37.)  Because the same crew services the same clients on the same route week after week, the crew does not need to discuss work assignments while traveling on the SBC truck.  (*Id.* ¶ 31.)  Laborers talked on their cell phones, slept, read the paper, socialized, and listened to music during the trip to the first client site and from the last site.  (*Id.* ¶¶ 32, 47.)

SBC estimates that 85% of its laborers ride as passengers in SBC trucks to the first client site in the morning and from the last client site at the end of the day.  (*Id.* ¶ 38.)  As stated in its Drive Time Policy, SBC does not consider this travel time as "working time" and, therefore, generally does not compensate laborers for this time.  (*Id.* ¶ 27; Drive Time Policy ¶¶ 4, 9.)  SBC compensates laborers, however, if this travel time exceeds 30 minutes.  (Defs. L.R. 561. Stmt. ¶ 28.)  SBC also will pay laborers for their travel to the first client site of the day if the laborer performs work, such as loading equipment onto the truck, before the truck departs from the SBC

facility in the morning. (*Id.* ¶ 34.) In the same vein, SBC will pay laborers for their travel back from the last client site of the day if the laborer performs work, such as unloading equipment or unhitching trailers, after the truck arrives at the SBC facility at the end of the day. (*Id.* ¶ 35.) In 2011, the supervisors would choose one laborer to help them load the truck in the morning before departing the SBC facility (*Id.* ¶ 70.) In addition, SBC compensates all laborers for the time spent traveling between client sites during the workday. (*Id.* ¶ 40.)

SBC provided Plaintiff Gonzalez with a Spanish-language version of SBC's Employee Handbook, which contains its Drive Time Policy. (*Id.* ¶ 24.) SBC informed Gonzalez when it hired him that he had the choice to report directly to the first client site or ride as a passenger in the SBC truck. (*Id.* ¶ 39.) Gonzalez elected to ride in the SBC truck from the SBC facility to the first client site in the morning and back to the SBC facility at the end of the day. (*Id.* ¶ 42.) Gonzalez testified that he would not have worked for SBC without this transportation. (*Id.*) He did not have a drivers' license, and he relied on his brother, who worked in SBC's construction department, to drive him to and from the SBC facility each day. (*Id.*) Gonzalez admitted that by using SBC's transportation, he saved money on gas and avoided additional wear and tear to the truck he co-owned with his brother. (*Id.*)

Gonzalez did not drive the SBC truck or perform work while traveling to and from the SBC facility on the truck. (*Id.* ¶¶ 46-47.) He alleges that he helped load materials onto the SBC truck in the morning before departing the SBC facility approximately 2-3 times per week in 2011 and at least once in 2012. (*Id.* ¶¶ 70, 71.) Gonzalez further alleges that in 2012 SBC failed to pay him for work he performed at SBC's facility after he returned from client sites in the afternoon. (*Id.* ¶ 72.) He claims that SBC failed to pay him for 2 minutes every other week

when he brought machines to the maintenance shop, 10-15 minutes every other day when he filled machines with gas, and 10-15 minutes each time he unhitched the trailer from the SBC truck. (*Id.*; R. 80, Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 72.)

## III. SBC's Use of the Fluctuating Work Week Method

Plaintiffs Gallardo and Alvarado assert claims against Defendants for violation of the FLSA and IMWL based on SBC's allegedly improper calculation of their overtime pay rate. (*See* Compl. Defs. L.R. 56.1 Stmt. ¶ 50.) SBC treated Plaintiffs Gallardo and Alvarado as non-exempt employees who were entitled to overtime pay. (Defs. L.R. 56.1 Stmt. ¶ 48.) SBC asserts that it paid Gallardo and Alvarado using the fluctuating work week ("FWW") method of compensation. (*Id.* ¶ 48.) Under the FWW method, SBC paid Gallardo and Alvarado a fixed weekly salary of $650, regardless of how many hours they worked, and additional overtime pay if they worked more than 40 hours in a workweek. (*Id.* ¶ 58.) SBC never paid Gallardo or Alvarado less than one-half times their regular hourly rate for overtime hours, and in practice, it paid them $8.25 for overtime hours, which is more than the FWW method required them to pay. (*Id.* ¶¶ 60, 68.)

Defendants claim that SBC's Human Resources Manager, Claire Storti, personally met all site supervisors, including Gallardo and Alvarado, during their new hire orientation and explained SBC's compensation policies to them. (*See id.* ¶¶ 52-54.) Plaintiffs, however, deny that Ms. Storti met with and explained SBC's compensation policies to all site supervisors. (Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶¶ 52-54.) Alvarado, for example, testified that he did not meet with Ms. Storti, and that Jim Gorsline—not Ms. Storti—explained SBC's compensation policies to him. (*Id.* ¶ 52; R. 61, Alvarado Dep. at 62:7-12; 30:7-31:21.) Additionally, Alvarado testified

that Mr. Gorsline agreed to pay him $12 per hour for overtime work.[3]  (Pl. Resp. to Defs. L.R. 56.1 Stmt. ¶ 54; Alvarado Dep. at 30:7-31:21.)

## IV.    Procedural History

Plaintiffs Gallardo, Alvarado, Gonzalez, Duran, and Guillermo Cazares filed this action on September 12, 2012, asserting claims for overtime pay under the FLSA, the IMWL, and the IWPCA.[4]  (Compl. ¶ 1.)  The parties conducted several months of class discovery, including written discovery and at least five depositions.  Class discovery closed on July 15, 2013.  (R. 32.)  Plaintiffs filed a motion to send notice to potential class members on August 2, 2013 (R. 43), and an amended motion to send notice on August 19, 2013.  (R. 49).

On September 4, 2013, Defendants moved for partial summary judgment with respect to (1) Plaintiff Gonzalez's unpaid travel time claim under the FLSA, (2) Plaintiffs Gallardo's and Alvarado's claims under the FLSA and the IMWL challenging SBC's use of the FWW method to calculate their overtime pay, and (3) all Plaintiffs' claims for unpaid wages under the IWPCA.  (*Id.*)  On September 23, 2013, Defendants filed a supplemental motion for summary judgment with respect to opt-in Plaintiff Duran's unpaid travel time claim under the FLSA.  (R. 75.)

---

[3] Defendants argue that the Court should disregard Alvarado's testimony that SBC allegedly agreed to pay him $12 per overtime hour because this testimony constitutes an "additional fact," and Plaintiffs failed to file a statement of additional undisputed material facts as required by Local Rule 56.1.  (*See* Defs. Reply Br. at 2-3.)  The Court disagrees.  Plaintiffs raised Alvarado's and Gallardo's testimony in their response to Defendants' Local Rule 56.1 Statement to support their denial of paragraphs 52-54.  This is proper—and, in fact, required—under Local Rule 56.1(b)(3)(B), which mandates that a party opposing summary judgment respond to the moving party's statement of facts with, in the case of any disagreement, "specific references to the affidavits, parts of the record, and other supporting materials relied upon."  *See* L.R. 56.1(b)(3)(B).  The Court, therefore, will consider Alvarado's and Gallardo's testimony cited in Plaintiffs' response to paragraphs 53-54 of Defendants Local Rule 56.1 Statement.

[4] Miguel Duran dismissed his claims without prejudice on June 10, 2013 (R. 32) and re-joined the FLSA claims as an opt-in plaintiff on September 13, 2013.  (R. 74.)  Plaintiffs dismissed Guillermo Cazares as a plaintiff with prejudice on July 25, 2013.  (R. 42.)

Defendants do not seek summary judgment on Gonzalez's and Duran's "off-the-clock" claims under the FLSA and the IMWL. (*See* Defs. Mot. ¶ 3; Defs. Supp. Mot. ¶ 6.)

## ANALYSIS

## I.     Defendants' Motions for Partial Summary Judgment

Defendants seek summary judgment with respect to (1) Plaintiffs Gonzalez's and Duran's unpaid travel time claim under the FLSA, (2) Plaintiffs Gallardo's and Alvarado's claims under the FLSA and the IMWL challenging SBC's use of the FWW method to calculate their overtime pay, and (3) Gonzelez's, Gallardo's, and Alvarado's claims for unpaid wages under the IWPCA.

### A.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson,* 477 U.S. at 255 (citation omitted). "A plaintiff must begin to meet

this burden by submitting admissible, supporting evidence in response to a proper motion for summary judgment." *Harney v. City of Chi.,* 702 F.3d 916, 925 (7th Cir. 2012).

### B. Northern District of Illinois Local Rule 56.1

"For litigants in the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment. The purpose of the local rule is to make the summary judgment process less burdensome on district courts, by requiring the parties to nail down the relevant facts and the way they propose to support them." *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir. 2012). Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. Of Trs.,* 233 F.3d 524, 527 (7th Cir. 2000). "The Rule is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information,' in determining whether a trial is necessary." *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).

Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Express, Inc.,* 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. L.R. 56.1(b)(3)(B)). The Court disregards Local Rule 56.1 statements and responses that do not cite to specific portions of the record or that

contain immaterial information, legal arguments, or evasive denials. *See, e.g., Cracco,* 559 F.3d at 632; *Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006); *Bordelon,* 233 F.3d at 528. "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1], those facts are deemed admitted for purposes of the [summary judgment] motion." *Cracco,* 559 F.3d at 632.

If the party opposing summary judgment wants the court to consider additional facts in deciding whether a genuine dispute of material facts exists, it must submit a statement of additional facts that purportedly require the denial of summary judgment. *See Ciomber v. Coop. Plus, Inc.,* 527 F.3d 635, 643 (7th Cir. 2008) (citing N.D. Ill. L.R. 56.1(b)(3)(C)). "[D]istrict court[s] [are] entitled to expect strict compliance with Local Rule 56.1." *Cichon v. Exelon Gen. Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) (quoting *Ammons v. Aramark Uniform Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004))). Thus, district courts, in their discretion, may "choose[] to ignore and not consider the additional facts that a litigant has proposed" if the litigant failed to comply with Local Rule 56.1. *See id.* at 809-10 (citing *Midwest Imports, Ltd. v. Coval,* 71 F.3d 1311, 1316 (7th Cir. 1995))).

Plaintiffs responded to Defendants' Local Rule 56.1 statement of undisputed material facts, but they did not propose any additional facts that require denial of Defendants' summary judgment motion pursuant to Local Rule 56.1(b)(3)(C). Instead, Plaintiffs included additional facts within their responses to Defendants' statement of facts. (*See* R. 80, Pl. L.R. 56.1(b)(3) Resp. ¶¶ 20, 22, 27, 30, 38, 60, 66, 74.) The Court will consider those additional facts only where Plaintiffs include them as support for their denial of Defendants' statement of fact consistent with Local Rule 56.1(b)(3)(B). (*See* note 3, *supra.*) The Court will not consider,

however, the additional facts included in Plaintiffs' responses to paragraphs 20, 22, 27, 30, 38, 60, 66, and 74 of Defendants' statement of facts because Plaintiffs failed to submit a statement of additional facts as Local Rule 56.1(b)(3) requires. Furthermore, the Court ignores the portions of Plaintiffs' responses that lack citations to the record or that contain improper legal arguments. (*See id.* ¶¶ 18, 22, 25, 26, 34, 39, 42, 43, 68, 69, 75, 76.)

### C. Uncompensated Travel Time under the FLSA

Defendants move for summary judgment with respect to Plaintiff Gonzalez's and Opt-in Plaintiff Duran's claims for unpaid travel time under the FLSA. (Defs. Mot. ¶¶ 8-12; Defs. Supp. Mot. ¶¶ 2-5.) Gonzalez and Duran seek compensation for the time they spent riding as a passenger in the SBC truck from the company's main facility to the first client work site of the day and back from the last client work site. (*See* Pls. Resp. Br. at 1-6.) Defendants argue that the Portal-to-Portal Act excludes compensation for this travel time because it was not "integral and indispensable" to Gonzalez's and Duran's landscaping duties and SBC provided this transportation primarily for the convenience of laborers. (*See* Defs. Mot. ¶ 8.)

### 1. The FLSA and the Portal-to-Portal Act

The FLSA requires employers to pay a minimum wage for a 40-hour workweek and additional overtime pay for hours worked over 40 per workweek. *See* 29 U.S.C. §§ 206-07; *see also Kasten v. Saint-Gobian Performance Plastics Corp.,* --- U.S. ----, 131 S. Ct. 1325, 1329, 179 L. Ed. 2d 379 (2011). Although the FLSA does not define the term "work," early Supreme Court cases construed the term broadly. *See IBP, Inc. v. Alvarez,* 546 U.S. 21, 25-26, 126 S. Ct. 514, 163 L.Ed.2d 288 (2005) (discussing earlier precedent).

In *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123,* 321 U.S. 590, 64 S. Ct. 698, 88 L. Ed. 949 (1944), the Supreme Court defined "work or employment" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598. Relying on this definition of "work," the Court held that the FLSA required employers to compensate miners for the time spent traveling from mine portals to the miners' underground work areas.[5] *Id.* at 603. Two years later, in *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946), the Court defined the statutory "workweek" to "include[e] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Id.* at 690-91. The Court held that the workweek included time factory workers spent walking from time clocks near a factory entrance gate to their workstations. *Id.*

In response to these early decisions, Congress passed the Portal-to-Portal Act of 1947, 61 Stat. 84, to narrow the coverage of the FLSA by excepting two activities that the Supreme Court had treated as compensable: "(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and (2) activities which are preliminary to or postliminary to said principal activity or activities." 29 U.S.C. § 254(a); *Alvarez,* 546 U.S. at 27; *see also Kellar v. Summit Seating Inc.,* 664 F.3d 169, 173-74 (7th Cir. 2011). Apart from these two express exceptions, though, "the Portal-to-Portal Act [did] not purport to change [the Supreme Court's] earlier descriptions of the terms 'work' and 'workweek,' or to define the term 'workday.'" *Alvarez,* 546 U.S. at 28.

---

[5] The Court later clarified that actual "exertion" was unnecessary for an activity to constitute "work" under the FLSA, noting that "an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen." *Armour & Co. v. Wantock,* 323 U.S. 126, 133, 65 S. Ct. 165, 89 L. Ed. 118 (1944).

Accordingly, the Supreme Court has interpreted the term "principal activity or activities," as used in the Portal-to-Portal Act, to include all activities that are "an integral and indispensable part of the principal activities for which covered workmen are employed." *Steiner v. Mitchell,* 350 U.S. 247, 257, 76 S. Ct. 330, 100 L. Ed. 267 (1956). "[A]ny activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under § 4(a) of the Portal-to-Portal Act" and is therefore compensable under the FLSA, even after the portal-to-portal amendments. *Alvarez,* 546 U.S. at 37.

### 2. Compensation for Travel Time under the FLSA

Applying these standards, courts have required compensation under the FLSA for travel that is "integral and indispensable" to an employee's principal activities, but they have excluded compensation for "normal home to work travel." *Compare D A & S Oil Well Servicing, Inc. v. Mitchell,* 262 F.2d 552, 555 (10th Cir. 1958) ("[E]mployees who transport equipment without which well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities."); *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1350 (10th Cir. 1986) (affirming district court's determination that the FLSA required compensation for the time an employee spent driving a "specially equipped truck containing many of the tools that he needed to service drilling rigs scattered across several states"), *disapproved of on other grounds by McLaughlin v. Richland Shoe Co.,* 468 U.S. 128, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988), *and Graham v. City of Chicago,* 828 F. Supp. 576, 582 (N.D. Ill. 1993) ("[T]ime [police officers] spent transporting police canines is more than merely 'riding' to work, which is excluded by the Portal to Portal Act. Rather, it is an integral and

indispensable part of the officers' principal duties as canine policies officers and thus not excluded from [FLSA] coverage.") *with Smith v. Aztec Well Servicing Co.,* 462 F.3d 1274, 1287-88 (10th Cir. 2006) (holding that the Portal-to-Portal Act excluded compensation for time spent carpooling to and from oil well sites); *Griffin v. S & B Eng'rs & Constructors, Ltd.,* 507 Fed. App'x 377, 382-83 (5th Cir. 2013) (holding that the travel time spent on mandatory bus rides between a set meeting site and the company's plant "is not compensable under the FLSA as it constitutes ordinary home-to-work-and-back travel"); *Bonilla v. Baker Concrete Constr., Inc.,* 487 F.3d 1340, 1342-43 (11th Cir. 2007) (holding that the time construction workers assigned to an airport terminal project spent traveling in employer vehicles to and from their work site was exempt from compensation under the FLSA) *and Vega v. Gasper,* 36 F.3d 417, 424-25 (5th Cir. 1994) (holding that the FLSA did not require compensation for the time day laborers spent riding optional company buses to chili pepper fields; "[t]he travel time was just an extended home-to-work-and-back commute" and, thus, a "noncompensable preliminary and postliminary activity").

In *Smith,* the Tenth Circuit, faced with circumstances similar to those at hand, held that the Portal-to-Portal Act excluded compensation for the time employees spent carpooling with their "24-hour crew" from a designated meeting point to the crew's assigned oil drilling site. *See* 462 F.3d at 1280-82, 1285-90. Although the defendant, Aztec Well Servicing Company ("Aztec"), did not require its 24-hour crews to drive together to and from well sites as a matter of official policy, crews usually did so for a number of logistical reasons. Those reasons included, among others, that Aztec would only reimburse gas costs for one vehicle per crew, parking at the drilling sites was often limited, and Aztec pressured drillers (the foremen of the 24-hour crews) to arrive on site with a full crew. Nearly all employees carpooled to the well sites with their

crew, and some drillers, in fact, required their crews to commute as a group. The crews would meet at a designated location, usually a convenience store, at a specified time, load their personal safety gear into the vehicle, and purchase food and drinks at the convenience store before departing for the drilling site. One crew member would also fill a cooler with drinking water for the crew. The driller usually drove the vehicle, and other crew members generally were free to spend their commute as they wished; they could sleep, eat, read, listen to music, or socialize. Some crews would discuss safety and other work issues to help the driver stay awake during the commute. Following a jury trial, the district court entered judgment as a matter of law in favor of Aztec, holding that the plaintiffs failed to establish that their travel time constituted "work" under the FLSA, and the Tenth Circuit affirmed. *See Smith,* 462 F.3d at 1277.

Similarly, in *Griffin,* the Fifth Circuit recently held that time spent traveling to and from work as part of a company's mandatory busing scheme was not compensable under the FLSA. *See* 507 Fed. App'x at 378-80, 382-83. Although the company required its employees to ride to its plant on company-sponsored buses and to follow the company's transportation rules of conduct while on those buses, employees did not perform work or receive work-related instructions during this commute. Employees, moreover, were free to spend their commute as they pleased, including sleeping or reading. The Fifth Circuit held that this travel time "[was] not compensable under the FLSA, as it constitute[d] ordinary home-to-work-and-back travel." *Id.* at 382. The court relied on the following Department of Labor interpretative statement regarding the portal-to-portal provisions of the FLSA in arriving at its decision:

> Examples of walking, riding, or traveling which may be performed outside the workday and would normally be considered "preliminary" or "postliminary" activities are . . . (2) riding on buses between a town and an outlying mine or factory where the employee is employed; and (3) riding on buses or trains from a

> logging camp to a particular site at which the logging operations are actually
> being conducted.

*Id.* at 383 (quoting 29 C.F.R. § 790.7(f)).  Because the Department of Labor specifically contemplated busing employees to their place of employment as an excluded activity under the portal-to-portal provisions of the FLSA, the Fifth Circuit held that the company's mandatory busing scheme did not conflict with prevailing FLSA jurisprudence.  *Id.*; *see also Vega,* 36 F.3d at 424-25 (travel time on company buses was not compensable where the employer did not require the workers to ride on the company buses, the workers performed no work before or during their commute, and the workers did not load tools onto the bus or otherwise prepare their equipment while riding the bus).

### 3.     Gonzalez's and Duran's Claims for Unpaid Travel Time

Gonzalez's and Duran's travel from the SBC main facility to the first client work site of the day and back to the SBC facility from the last client work site was not an "integral and indispensable" part of their principal employment activities.  *See, e.g., Smith,* 462 F.3d at 1287-88; *Griffin,* 507 Fed. App'x at 382-83; *Vega,* 36 F.3d at 424-25.  Thus, the FLSA, as amended by the Portal-to-Portal Act, excludes compensation for this travel time.

It is undisputed that SBC did not require laborers to report to the SBC main facility at the beginning or end of the workday.  (Defs. L.R. 56.1 Stmt. ¶ 25.)  Nor did SBC require crews to ride together in the SBC truck to the first work site or back from the last work site of the day.  (*Id.* ¶ 25.)  Instead, SBC offered laborers the option of riding as passengers in the SBC truck to and from the company's main facility as part of its Drive Time Policy, but informed laborers that it would not compensate them for this travel time unless the laborers performed work before departing the SBC facility in the morning or after arriving back at the SBC facility at the end of

the day.[6]  (*Id.* ¶¶ 26-27.)  Laborers who took advantage of this free transportation (like Gonzalez

and Duran) performed no work while commuting in the SBC truck (*id.* ¶ 30), nor did they

discuss work assignments during the ride.  (*Id.* ¶¶ 30-31, 46.)  Rather, Gonzalez, Duran, and

other laborers used their travel time for activities that persons often perform during their home-

to-work commute: talking on their cellphones, drinking coffee, sleeping, socializing, reading,

and listening to music.  (*Id.* ¶¶ 32, 47.)

Plaintiffs raise several arguments regarding why the FLSA purportedly requires SBC to

compensate Gonzalez and Duran for their travel time (*see* Pls. Resp. Br. at 2-6), but none are

availing.  First, Plaintiffs argue that "[b]ecause Plaintiff Gonzalez and similarly situated Laborers

commonly performed pre- and post-shift tasks at the SBC facility prior to and upon return from

their trips in SBC trucks, [their] travel time is compensable."  (*Id.* at 2-4.)  Plaintiffs, however,

misunderstand Defendants' motion for partial summary judgment.  Defendants specifically

limited their motion to Gonzalez's and Duran's claims "on those occasions when Gonzalez [and

Duran] performed no unpaid work at the SBC main facility."  (Defs. Mot. at 2 n.1; *see also* Defs.

Supp. Mot. ¶ 6; Defs. Reply Br. at 4.)  Defendants have not moved for summary judgment with

respect to Gonzalez's and Duran's "off-the-clock" claims, including their claims for paid travel

when they performed work at the SBC facility.  Accordingly, Plaintiffs' arguments regarding

laborers' alleged pre- and post-shift work at the SBC facility have no bearing on Defendants'

motion for partial summary judgment.  Plaintiffs, of course, may raise these arguments regarding

Gonzalez's and Duran's "off-the-clock" claims at the appropriate time.

---

[6] SBC also compensated employees if the start or end-of-the-day commutes took more than 30 minutes
(*id.* ¶ 28), but that policy is not at issue in the present motion.

Second, Plaintiffs argue that SBC benefitted from providing this transportation option to laborers and, therefore, must compensate laborers who took advantage of the transportation. (Pls. Resp. Br. at 4-5.) Plaintiffs argue that "given that a majority of Defendants' Laborer population lack[s] both a vehicle and the licensing to transport themselves, most employees ha[d] no feasible alternative outside of utilizing Defendants' transport to and from each work site." (*Id.* at 2.) Thus—Plaintiffs argue—SBC adopted its Drive Time Policy for its own benefit in "ensuring a continued workforce," not for the "convenience of laborers." (*Id.*) Plaintiffs argue that SBC's Drive Time Policy further benefitted the company by assuring that site supervisors would have adequate help loading and unloading the SBC trucks at SBC's main facility and by guaranteeing that crews arrived at a client's location together in a company car. (*See id.* at 4-5.)

The principal case on which Plaintiffs rely for this argument, *Graham v. City of Chicago,* 828 F. Supp. 576 (N.D. Ill. 1993), is readily distinguishable. In *Graham,* the court held that the time police canine officers spent transporting the animals to and from work amounted to "more than merely 'riding' to work." *Id.* at 582. "Rather, it is an integral and indispensable part of the officers' principal duties as canine police officers and thus not excluded from [FLSA] coverage." *Id.* As the court noted,

> Certainly, if the City provided a central kennel for the dogs, the time spent
> picking up the dogs at that kennel and transporting them to work would be
> compensable even though it would be "riding" to work. The City may not escape
> liability by requiring the officers to board the dogs at home.

*Id.* Additionally, the court held that transporting the canines did not constitute preliminary or postliminary work because the city required officers to feed, exercise, and otherwise care for the dogs at home before and after the commute. *Id.*

In this case, on the other hand, Gonzalez and Duran did not perform any work while riding in the SBC truck between the company's main facility and the first and last client work sites. Nor did SBC require Gonzalez and Duran to transport the equipment on the truck as part of their principal duties. Moreover, as previously mentioned, Defendants have not moved for summary judgment with respect to Plaintiffs' unpaid travel time claims on those occasions when Plaintiffs performed work at the SBC facility before or after their commute.

Furthermore, the courts in *Smith, Griffin,* and *Vega* rejected arguments similar to the ones Plaintiffs raise here. In *Smith,* the Tenth Circuit rejected the plaintiffs' argument that requiring employees to travel together made that travel time compensable. *See* 462 F.3d at 1288. The Tenth Circuit held that "[a] restriction imposed on the manner in which the plaintiffs can travel to and from their workplace is relevant only if it shows that their travel time was integral and indispensable to their principal activities." *Id.* That is, if a company required workers to carpool to and from work "for the purpose of allowing them to conduct essential planning and preparation work needed for their job," then the travel time might be compensable. *Id.* Where a company required workers to carpool for reasons related to the "logistics of commuting rather than anything integral and indispensable to their principal activities," however, their travel time fell within the meaning of the Portal-to-Portal Act and, thus, was not compensable. *Id.* The fact that "drillers were under pressure from [the company] to arrive on site with a full crew, and the best way for drillers to ensure that everyone on their crew arrived on time was to drive them all to the well site personally" did not change the court's decision. *See id.* at 1280.

Accordingly, even if the laborers chose to ride on the SBC truck because they had "no feasible alternative" and SBC received some benefits from having a continued workforce and

assuring that crews arrived to client work sites together, those facts would not transform ordinary home-to-work commute time into an "integral and indispensable" part of Plaintiffs' principal activities. *See id.*; *see also Griffin,* 507 Fed. App'x at 383 (holding that mandatory busing scheme did not make travel time compensable even though the company required workers to follow its "Transportation Rules of Conduct" while on the bus because "those rules were simply logistical, administrative, and marginally restrictive, and not 'integral and indispensable' to [plaintiff's] principal activities"); *Vega,* 36 F.3d at 425 (time seasonal farm workers spent travelling on company-provided buses to picking fields was "ordinary to-work or from-work travel and not compensable"). Furthermore, the benefit of assuring that site supervisors had sufficient help to load and unload the SBC trucks does not make Gonzalez's and Duran's travel time compensable. Defendants have not moved for summary judgment for those occasions when Gonzalez and Duran performed such work, and the mere fact that they made themselves available for pre- and post-shift work does not make that time compensable. *See Vega,* 36 F.3d at 425 ("Wait time is compensable when it is part of a principal activity of the employee, but not if it is a preliminary or postliminary activity."); *cf. Dinges v. Sacred Heart St. Mary's Hosp., Inc.,* 164 F.3d 1056, 1056 (7th Cir. 1999) (determining whether "on call" hours are compensable "depends on whether one has been 'engaged to wait' or is 'waiting to be engaged'").

Finally, Plaintiffs argue that because the determination of whether an activity is compensable under the FLSA requires "a very fact-specific, case-by-case inquiry," the Court should not decide this issue on summary judgment. (Pls. Resp. Br. at 6.) "FLSA claims typically involve complex mixed questions of fact and law—*e.g.,* what constitutes the 'regular rate,' the 'workweek,' or 'principal' rather than 'preliminary or postliminary' activities."

*Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 743, 101 S. Ct. 1437, 67 L. Ed. 2d

641 (1981); *see also Graham,* 828 F. Supp. at 583 ("The precise nature of the Plaintiff's duties is

a question of fact while the application of the FLSA to those duties is clearly a question of

law.").  Although "[a] mixed question does not normally lend itself to summary disposition,"

where, as here, the parties do not dispute the salient facts, "[a]ll that remains is a question of the

legal significance of the facts."  *Graham,* 828 F. Supp. at 583.  Summary judgment is therefore

appropriate on Gonzalez's and Duran's unpaid travel time claims.  *Id.*

### D.  Overtime Pay Rate Under the "Fluctuating Workweek" Method

The FLSA and the IMWL require employers to compensate employees for time worked

over 40 hours per workweek at an overtime rate "not less than one and one-half times the regular

rate at which he is employed."  *See* 29 U.S.C. § 207(a)(1); 820 ILCS 105/4a(1).  Both the FLSA

and the IMWL give employers the option of calculating a salaried employee's regular rate of pay

and, in turn, his overtime pay using the "fluctuating workweek" (FWW) method if his hours of

work fluctuate from week to week.  *See* 29 C.F.R. § 778.114(a); 56 Ill. Admin. Code

§ 210.430(f).

Under the FWW, an employee receives a fixed base salary as straight-time pay for

whatever hours the employee works in a workweek (regardless of the number) plus an additional

overtime premium at a rate of 50% of his regular hourly pay for hours worked over 40.[7]  *See* 29

C.F.R. § 778.114(a); *see also Condo v. Sysco Corp.,* 1 F.3d 599, 601-02 (7th Cir. 1993); *Heder v.*

*City of Two Rivers,* 295 F.3d 777, 779-80 (7th Cir. 2002).  An employee's "regular hourly pay"

under the FWW formula equals his base weekly salary divided by the total number of hours

_____

[7] The overtime provision of the IMWL, 820 ILCS 105/4a(1), parallels that of the FLSA, and "Illinois
courts apply the same principles, including the FWW formula, to the state provision."  *See Urnikis-Negro*
*v. American Family Prop. Servs.,* 616 F.3d 665, 672 n.3 (7th Cir. 2010) (citations omitted).

worked during the week, including overtime hours.  *See* 29 C.F.R. § 778.114(a); *Condo,* 1 F.3d at 601-02.  Because the employee receives straight-time compensation for any overtime hours worked as part of his base salary, the employer must pay an additional overtime premium of only 50% of his regular hourly rate to satisfy the FLSA's and the IMWL's requirement to pay overtime at "one and one-half times the regular rate."  *See* 29 C.F.R. § 778.114(b).  Section 778.114 provides the following example of the FWW calculations for an employee making $600 per week:

> If during the course of 4 weeks this employee works 40, 37.5, 50, and 48 hours, the regular hourly rate of pay in each of these weeks is $15.00, $16.00, $12.00, and $12.50, respectively.  Since the employee already has received straight-time compensation on a salary basis for all hours worked, only additional half-time pay is due.  For the first week the employee is entitled to be paid $600; for the second week $600.00; for the third week $660 ($600 plus 10 hours at $6.00 or 40 hours at $12.00 plus 10 hours at $18.00); [and] for the fourth week $650 ($600 plus 8 hours at $6.25, or 40 hours at $12.50 plus 8 hours at $18.75).

29 C.F.R. § 778.114(b).  As this example illustrates, when an employee "regularly works more than 40 hours per week, the FWW method results in both a lower regular rate of pay and a significantly lower award of overtime pay" than calculating compensation based on the variable workweek method, which contemplates a set hourly rate for up to 40 hours per workweek ($10 per hour, for example) and an overtime rate of one and one-half times that rate for overtime ($15 per hour).  *See Urnikis-Negro,* 616 F.3d at 666, 672-73.

An employer may use the FWW method only if the compensation plan satisfies the following five conditions: (1) the employee's work hours fluctuate from week-to-week; (2) the employee receives a fixed weekly salary (excluding overtime premiums) regardless of the number of hours worked; (3) the employee's fixed base salary compensates him at a rate no less than the legal minimum wage for all hours worked; (4) the employee receives at least 50% of his

regular hourly pay for all overtime hours worked; and (5) a "clear mutual understanding" exists between the employee and employer that the employee's fixed salary "is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." *See* 29 C.F.R. § 778.114(a)-(c); *see also Caraballo v. City of Chicago,* --- F. Supp. 2d ----, 2013 WL 4552255, at *8 (N.D. Ill. Aug. 27, 2013) (listing requirements); *Lance v. Scotts Co.,* No. 04 5270, 2005 WL 1785315, at *4 (N.D. Ill. July 21, 2005) (same).  In this case, the parties dispute whether Gallardo and Alvarado's compensation met the fourth and fifth conditions.

### 1.      Overtime Premium of No Less Than a "Half-Time Rate"

The fourth condition for using the FWW method requires an employee to receive at least 50% of his regular hourly pay for any overtime hours worked.  Defendants argue that because "SBC never paid Alvarado and Gallardo less than a half-time rate for overtime hours," no genuine issue of fact exists regarding whether Defendants complied with this condition of the FWW method.  (*See* Defs. Mem. at 6.)  Defendants correctly point out that an employer does not run afoul of the FLSA by paying its employees *more* than required under the FWW method. (Defs. Reply Br. at 10.)  Indeed, Section 778.114(c) expressly allows employers to do so: "Where all the legal prerequisites for use of the 'fluctuating workweek' method of overtime payment are present, the Act, in requiring that 'not less than' the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more."  29 C.F.R. § 778.114(c).

SBC paid Gallardo and Alvarado a fixed weekly salary of $650.  Accordingly, in a 40-hour workweek, Gallardo and Alvarado earned a regular hourly rate of $16.25.  Under the FWW

formula, an employee's regular hourly pay rate and, in turn, his half-time overtime premium decrease as the number of overtime hours he works increases. *See Urnikis-Negro,* 616 F.3d at 666, 672-73. It follows that the FLSA would never require SBC to pay Gallardo and Alvarado more than an overtime premium of $8.125 per hour ($16.25 ÷ 2) under the FWW method. Thus, by paying Gallardo and Alvarado a flat overtime rate of $8.25, Defendants complied with the FWW method's requirement that they pay Gallardo and Alvarado an overtime premium "*no less than* one-half [their] regular rate of pay." *See* 29 C.F.R. § 778.114(a).

Plaintiffs submit several pay stubs for Gallardo and Alvarado that, Plaintiffs argue, "establish[] that an FWW method of calculating pay was never part of the equation." (Pls. Resp. Br. at 9 & Exs. A-I.) The pay stubs confusingly list a pay rate of $16.25 per hour for regular hours—even though under the FWW method the regular hourly rate should fluctuate based on the number of hours worked per week—and an additional pay rate of $18.00 per hour, for which the FWW method provides no basis. (*Id.*) Despite this issue, however, Plaintiffs have failed to establish that SBC paid Gallardo or Alvarado an overtime premium of *less than* one-half times their regular hourly rate in any given week. Plaintiffs have the burden to "set forth specific facts showing that there is a genuine issue for trial," *see Anderson,* 477 U.S. at 255, and Plaintiffs simply have not met their burden with respect to whether Defendants paid them less than the FWW method requires.

### 2.    Clear Mutual Understanding

The fifth condition for using the FWW method requires that a "clear mutual understanding" exists between the employee and employer that the employee's fixed salary "is compensation (apart from overtime premiums) for the hours worked each workweek, whatever

their number, rather than for working 40 hours or some other fixed weekly work period." *See* 29 C.F.R. § 778.114(a). Section 778.114 does not require that an employee understand the precise details of how his employer calculates his overtime pay under the FWW formula, s*ee Bailey v. County of Georgetown,* 94 F.3d 152, 156-57 (4th Cir. 1996) ("[N]either [29 C.F.R. § 778.114] nor the FLSA in any way indicates that an employee must also understand the manner in which his or her overtime pay is calculated."); *see also Griffin v. Wake County,* 142 F.3d 712, 717 (4th Cir. 1998) ("[T]he regulation does not require an employer to make all employees personnel specialists."); *Lance,* 2005 WL 1785315, at *8 ("[W]e do not find that the FLSA places the burden on the employer to hold an employee's hand and specifically tell him or her precisely how the payroll system works." (quoting *Griffin,* 142 F.3d at 717)), but as the Seventh Circuit has explained, it does require "a 'clear mutual understanding' that the base [salary] rate constitutes straight time for *any* overtime worked." *Heder,* 295 F.3d at 780 (emphasis in original) (citing 29 C.F.R. § 778.114(a)). In other words, an employee who earns a weekly salary of $600 and works 50 hours in a week must understand that his salary compensates him for all 50 hours (excluding overtime premiums)—not just the first 40. *See id.*; *see also* 29 C.F.R. § 778.114(a). On the other hand, he does not need to understand precisely how to calculate his regular hourly pay ($600 ÷ 50 = $12.00), his overtime premium ($12.00 x 1/2 = $6.00), or his total overtime pay per hour ($12.00 + $6.00 = $18.00). *See, e.g., Bailey,* 94 F.3d at 156-57; *Lance,* 2005 WL 1785315, at *8.

Defendants argue that the undisputed facts establish that Gallardo and Alvarado understood from the beginning of their employment that SBC would pay them a weekly salary of $650 "for all hours worked, regardless of how few or many, plus additional compensation for

overtime." (*See* Defs. Reply Br. at 8.) Defendants rely on the following evidence to support their argument. First, Defendants submitted an affidavit from Claire Storti, SBC's Human Resources Manager, stating that she personally had conducted Gallardo and Alvarado's new hire orientations and explained SBC's compensation scheme to them. (*See* Defs. L.R. 56.1 Stmt. ¶¶ 52-54 & Ex. 2 ¶ 8.) Specifically, Ms. Storti averred:

> I explained to [Gallardo and Alvarado] that they would be paid a salary of $650 per week regardless of the number of hours that they work. I also explained to them that they would receive additional compensation for hours they worked over 40 in a workweek. I sometimes refer to the overtime compensation as "premium pay," as a way to explain to employees that they were receiving compensation for overtime hours that is in addition to their regular $650 salary.

(*Id.* at Ex. 2 ¶ 8.) Second, Defendants argue that Gallardo and Alvarado admitted in their depositions and interrogatory responses that they understood how SBC calculated their compensation. (*See* Defs. Mem. at 13-14; Defs. Reply Br. at 8.) Third, Defendants argue that Gallardo and Alvarado's paychecks "reinforce[d]" their admissions of a mutual understanding regarding their compensation "because the paychecks show that Gallardo and Alvarado were always paid a $650 salary in every week and additional compensation for overtime." (Defs. Reply Br. at 9.) According to Defendants, these undisputed facts warrant granting Defendants summary judgment on Gallardo and Alvarado's FLSA claims.

Plaintiffs, however, dispute Defendants' evidence. To begin, Alvarado has denied that Claire Storti met with him and explained his compensation to him, as Defendants' contend. (R. 61, Alvarado Dep. at 62:7-12.) Alvarado testified that he discussed his compensation with Jim Gorsline—not Ms. Storti. (*Id.* at 30:7-31:21, 62:7-9.) Alvarado further testified that Mr. Gorsline agreed that SBC would pay Alvarado $12 per hour for any overtime he worked. (*Id.* at 30:7-31:21.) When Alvarado noticed that SBC was not paying him $12 per hour of

overtime from his paychecks, he raised the issue with Mr. Gorsline, who said he would "fix it."

(*Id.* at 31:9-32:21.)

Gallardo, on the other hand, admitted that he met with Ms. Storti at the beginning of his

employment.[8]  (Gallardo Dep. at 63:19-23.)  A factual dispute remains, however, regarding whether

Gallardo had a "clear understanding" of how SBC would calculate his compensation.  Gallardo's

deposition testimony suggests that he believed his base salary compensated him *only* for the first

40 hours of the workweek:

> Q.     How much were you paid?
>
> A.     16.25 the hour.
>
> Q.     Were you paid a salary?
>
> MR. BILLHORN:  Object to the form.  Go ahead and answer.
>
> Q.     Were you paid a salary?
>
> THE WITNESS:  Yes.
>
> BY MR. CALDARONE:
>
> Q.     And was that salary $650 a week?
>
> A.     Not per week.
>
> Q.     Let me ask it a different way.  Did you receive a minimum salary
>        of at least $650 a week?

---

[8] Plaintiffs denied that Ms. Storti conducted Gallardo's new hire orientation.  (*See* Pls. Resp. to Defs. L.R. 56.1 Stmt. ¶ 52 ("Gallardo never testified regarding meeting with Storti."); *see also id.* ¶¶ 53-54; Pls. Resp. Br. at 7 ("Gallardo never references whom he met with.").)  Contrary to Plaintiffs' assertion, Gallardo did, in fact testify that he met with Ms. Storti when he first started working for SBC:

> Q. When you started – when you first stated working with the company, did you meet with Claire [Storti] at the beginning of your employment?
>
> A. We had a meeting for insurances, for different things, yes.

(Gallardo Dep. at 63:19-23.)  Paragraphs 52 and 53 of Defendants' statement of facts are, therefore, undisputed with respect to Gallardo.

MR. BILLHORN:  Object to the form of the question.  You can answer.

THE WITNESS:  They paid me 650 for 40 hours.  My usual work schedule was 12 hours a day.

       So then, per week, I would work over 50 hours, over 60 hours. And I never – I wouldn't see whether the $16.50 that was my –

THE INTERPRETER:  I'm sorry.  He's correcting himself, the interpreter speaking.

THE WITNESS:  The 16.25 that was my salary, where that was actually coming from.

BY MR. CALDARONE:

Q.      Okay.  So you – so just so I'm clear, you would receive $650 a week, and then –

A.      For 40 hours, yes.

Q.      And then, when you worked more than 40 hours, you would receive additional compensation?

MR. BILLHORN:  Go ahead and answer.

THE WITNESS:  Yes.

(Gallardo Dep. at 19:23-21:5: *see also id.* at 98:21-24 ("Q.  And you testified that it was explained to you that you would be paid $650 per week for the first 40 hours, is that correct? A.  Yes, that's true.").)  The paychecks SBC issued to Gallardo, moreover, may have added to his confusion because several erroneously listed pay rates of $16.25 or $18.00, even though the FWW formula provided no basis for those rates.  (*See* Pls. Resp. to Defs. L.R. 56.1 Stmt. at Exs. B, E-F.)

Alvarado's and Gallardo's testimony undermines Defendants' argument that they clearly understood that their base salaries compensated them (apart from overtime premiums) for all hours worked, including overtime hours.  Contrary to Defendants' assertion, Alvarado's and

Gallardo's testimony suggests that they believed their $650 salary compensated them for up to, but not more than, 40 hours in a workweek, and that SBC would pay them a separate rate for hours over 40. In other words, their testimony suggests that Alvarado and Gallardo may not have understood that their base salary served as compensation (apart from overtime premiums) for their overtime hours in addition to their first 40 hours of the week. This creates a genuine issue of fact regarding whether the "clear mutual understanding" that Section 778.114 requires did, in fact, exist. *See Heder,* 295 F.3d at 780.

Additionally, Defendants' reliance on Plaintiffs' interrogatory responses as evidence of Alvarado's and Gallardo's alleged understanding of their compensation is unavailing. Defendants asked Gallardo and Alvarado to identify, among other things, "compensation paid and other benefits received," to which both responded, "I was paid a weekly salary of $650 plus $8.25 for overtime." (*See* Defs. L.R. 56.1 Stmt. at Ex. 6 ¶ 2.) Their responses indicate their understanding in 2013 of what SBC had, in fact, paid them, not necessarily their understanding during their employment of what the FLSA required SBC to pay them.

Defendants argue that summary judgment is appropriate even if Gallardo and Alvarado did not understand how SBC calculated their overtime pay as long as "[they] understood that they would be paid a salary of $650 per week plus additional compensation for overtime hours." (*See* Defs. Reply Br. at 9-11.) The Court disagrees. Although the FWW method does not require employees to understand the exact calculations used to determine their overtime premiums, it does require employees to have a clear understanding that their fixed salary "is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period." 29

C.F.R. § 778.114(a); *see also Heder,* 295 F.3d at 780 ("[O]nly a 'clear mutual understanding' that the base rate constitutes straight time for *any* overtime worked enables the employer to calculate pay under the fluctuating workweek plan.").  None of the cases upon which SBC relies suggest otherwise.  *See Samson v. Apollo Resources, Inc.,* 242 F.3d 629, 636-37 (5th Cir. 2001) (rejecting argument that 29 C.F.R. § 778.114 required an employee to understand the number of hours the employer would expect him to work or that he would not receive his fixed salary for weeks in which the he did not work at all);  *Bailey,* 94 F.3d at 155 (holding that the defendant did not have to prove that each plaintiff "knew that the more overtime he or she worked, the less he or she would be paid for each of those overtime hours");  *Lance,* 2005 WL 1785315, at *7-8 (finding that a "clear mutual understanding" existed because the the plaintiff "understood the critical aspects of the FWW," even though he did not understand exactly how to calculate his overtime rate using the formula); *Stein v. Guardsmark, LLC,* No. 12 Civ. 4739 (JPO), 2013 WL 3809463, at *9 (S.D.N.Y. July 23, 2013) ("Taken together, the evidence leaves no room for doubt about the existence of a clear and mutual understanding that Plaintiff's 'fixed salary [was] compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period.").  Because a genuine issue of fact exists regarding whether Gallardo and Alvarado understood that their base salaries served as compensation (apart from overtime premiums) for *all* hours worked, not just the first 40 hours in the workweek, summary judgment is inappropriate.

Accordingly, the Court denies Defendants' motion for partial summary judgment with respect to Gallardo's and Alvarado's claims for improper calculation of his overtime pay rate.

E.       **Agreement to Pay the Claimed Wages under the IWPCA**

Plaintiffs claim that SBC violated the IWPCA by (1) failing to pay Gonzalez for "off-the-clock" work he performed before and after shifts and (2) failing to pay overtime to Gallardo and Alvarado at their agreed-to rates.  (*See* Pl. Resp. Br. at 11-14.)  The IWPCA requires employers, at least semi-monthly, to pay employees all wages earned during the semi-monthly pay period.  820 ILCS 115/3.  Additionally, the IWPCA requires employers to pay final compensation, including all wages due, to separated employees at the time of their separation or at least no later than their next regularly scheduled payday.  *Id.* §§ 2, 5.  "Wages" consist of "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation."  *Id.* § 2.

To prevail on an IWPCA claim, a plaintiff must show that he or she had a valid contract or employment agreement.  *See id.*; *Hess v. Kanoski & Assocs.,* 668 F.3d 446, 452 (7th Cir. 2012); *Stark v. PPM America, Inc.,* 354 F.3d 666, 672 (7th Cir. 2004).  An "agreement" under the IWPCA is "broader than a contract," and "requires only a manifestation of mutual assent on the part of two or more persons."  *Zabinsky v. Gelber Grp., Inc.,* 347 Ill. App. 3d 243, 250, 283 Ill. Dec. 61, 807 N.E.2d 666 (Ill. App. Ct. 2004); *see also Hess,* 668 F.3d at 452 (quoting *Zabinsky*).  The agreement need not be a "formally negotiated contract," nor must it contain the "formalities and accompanying legal protections of a contract."  *Landers-Scelfo v. Corporate Office Sys., Inc.,* 356 Ill. App. 3d 1060, 1067-68, 293 Ill. Dec. 170, 827 N.E.2d 1051 (Ill. App. Ct. 2005); *Zabinsky,* 347 Ill. App. 3d at 249.  "[A]n employer and an employee, by acting in a

manner consistent with an employment agreement, can set the material terms of the agreement, including the amount of compensation . . . ." *Landers-Scelfo,* 356 Ill. App. 3d at 1068.

The IWPCA requires "that the employer honor his contract;" it does not, however, confer rights to compensation that are absent from the employee's contract or employment agreement. *See Galietta v. Comdisco Holding Co., Inc.,* No. 02 C 7030, 2003 WL 685645, at *3 (N.D. Ill. Feb. 27, 2003) (quoting *National Metalcrafters v. McNeil,* 784 F.2d 817, 824 (7th Cir. 1986)). "It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed." *Brown v. Lululemon Athletica, Inc.,* No. 10 C 05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 27, 2003) (collecting cases); *see also Jaramillo v. Garda, Inc.,* No. 12 C 662, 2012 WL 1378667, at *2 (N.D. Ill. Apr. 20, 2012) ("[T]he IWPCA merely demands that employers pay whatever wages were agreed to."); *Colgren v. County Line Cartage, Inc.,* No. 99 C 8268, 2000 WL 1154072, at *4 (N.D. Ill. Aug. 14, 2000) ("Just as the IWPCA does not mandate vacation pay, it does not mandate overtime pay, but merely requires that the employer pay its employees the wage it promised them."). A violation of the FLSA or the IMWL alone, without a corresponding violation of an employment contract or agreement, therefore, cannot establish a violation of the IWPCA. *See Palmer v. Great Dane Trailers,* No. 05 C 1410, 2005 WL 1528255, at *4 (N.D. Ill. June 28, 2005) (dismissing the plaintiff's IWPCA claim because she failed to allege that an agreement required her employer to pay overtime and, thus, "the correct route for [plaintiff] to obtain earned pay, including potential overtime pay, [was] through timely FLSA and IMWL claims," not the IWPCA).

### 1. Payment for "Off-the-Clock" Work

Plaintiffs claim that SBC and Gonzalez had an "implicit understanding" that SBC would compensate him for "all hours worked," including "off-the-clock" work he performed at the SBC facility before and after his shifts, and SBC failed to abide by that understanding, in violation of the IWPCA. (*See* Pl. Resp. Br. at 12.) The undisputed facts, however, show that no such agreement existed. Indeed, if any agreement existed, it was an agreement that SBC would *not* pay Gonzalez for pre- and post-shift work unless the site supervisor selected Gonzalez as the "lead" crew member for the day and authorized him to clock in to help with tasks at the SBC facility.

SBC's employee handbook states that "[n]o laborer is allowed to perform work of any kind on SBC property unless they have prior authorization from the department manager," and, moreover, "[i]f a laborer reports to work prior to his/her designated starting time, he/she will not be permitted to begin work early, except with the approval of the site foreman or department manager." (Defs. L.R. 56.1 Stmt. at Ex. 4, ¶ 2; *see also id.* ¶ 8 ("While waiting for the free transportation to your first job site, laborers are not considered to be working and therefore . . . [s]hould not engage in any work related tasks without prior authorization, this includes tasks that are assigned or assumed[.]").) Additionally, as Plaintiffs admit, site supervisors had an "unofficial policy" of clocking in only one laborer to help with pre- and post-shift tasks at the SBC facility. (*See* Pls. Resp. Br. at 13; Pls. Resp. to Defs. L.R. 56.1 Stmt. ¶ 36.) Gonzalez, moreover, knew at the time he performed "off-the-clock" work that he was not clocked in and, thus, SBC would not pay him for that work. (*See* Pls. Resp. to Defs. L.R. 56.1 Stmt. ¶ 75; *see also* R. 63, Gonzalez Dep. at 45:1-51:6.) Because the evidence shows that no agreement existed

between SBC and Gonzalez to pay Gonzalez for "off-the-clock" work performed at the SBC facility, Gonzalez has no claim under the IWPCA. *See, e.g., Galietta,* 2003 WL 685645, at *3; *Brown,* 2011 WL 741254, at *3; *Jaramillo,* 2012 WL 1378667, at *2; *Colgren,* 2000 WL 1154072, at *4. Gonzalez may seek recourse for alleged unpaid overtime under the FLSA, but, without an agreement, his IWPCA claim fails. *See Palmer,* 2005 WL 1528255, at *4.

## 2. Overtime Pay Calculated Using the FWW Method

Alvarado and Gallardo claim that SBC violated the IWPCA by failing to pay them agreed-to overtime rates. (*See* Pls. Resp. Br. at 14.) Plaintiffs contend that Alvarado negotiated a specific overtime rate of $12 per hour with Mr. Gorsline, the Division Manager of SBC's Property Improvement Division, and that SBC violated that agreement by paying him an overtime rate of only $8.25 per hour. (*Id.* at 8 (citing R. 61, Alvarado Dep. at 31:12-23).) SBC denies that Mr. Gorsline agreed to pay Alvarado $12 per hour of overtime. (*See* Defs. Reply Bt. at 14.) Furthermore, SBC argues that Alvarado's decision to continue working for SBC for more than a year after he discovered from his paychecks that SBC was not paying him $12 per hour for overtime "demonstrates that he accepted a modification to the alleged 'agreement' of $12 for overtime." (*Id.*) While SBC may raise these arguments at trial, Plaintiffs have offered sufficient evidence to create a genuine issue of fact on Alvarado's IWPCA claim and, thus, survive summary judgment. *See Anderson,* 477 U.S. at 248.

Plaintiffs, on the other hand, have failed to offer sufficient evidence to survive summary judgment on Gallardo's IWPCA claim. Unlike Alvarado, Gallardo does not allege that SBC expressly agreed to pay him a specific overtime rate. Gallardo alleges, instead, that SBC violated an "implicit employment agreement" regarding his overtime compensation. (*See* Pls.

Resp. Br. at 14.)  According to Gallardo, SBC violated this implicit agreement when it failed to compensate him according to "the terms described by SBC's handbook to pay overtime according to the FLSA . . . and Management's description of SBC policies."  (*See* Pls. Resp. Br. at 14.)

Even an implicit agreement, however, requires a "manifestation of mutual assent" on the part of the employer and the employee, *see Zabinsky,* 347 Ill. App. 3d at 250; *Hess,* 668 F.3d at 452, and Gallardo has not offered any evidence that SBC assented to calculating his overtime pay based on some method other than the FWW method.  The SBC handbook states only that Gallardo would receive "overtime pay according to the provisions allowed by the Fair Labor Standards Act."  (Pls. Resp. Br. at Ex. J, p. 11.)  As explained above, the FLSA permits employers to compensate salaried employees whose hours fluctuate from week to week under the FWW method.  *See* 29 C.F.R. § 778.114(a); *Condo,* 1 F.3d at 601-02; *Heder,* 295 F.3d at 779-80.  Ms. Storti, moreover, explained to Gallardo that SBC would calculate his compensation according to the FWW method.  (*See* Defs. L.R. 56.1 Stmt. at Ex. 2 ¶ 8.)  Plaintiffs have failed to put forward evidence to contradict Ms. Storti's affidavit with respect to her meeting with Gallardo.  (*See* note 8, *supra.*)

Furthermore, although Gallardo's alleged lack of understanding regarding how SBC calculated his overtime pay is sufficient to save his FLSA claim from summary judgment, it cannot save his IWPCA claim.  To survive summary judgment on his FLSA claim, Gallardo needs to prove only that a genuine issue of fact exists regarding his own understanding of his compensation.  *See* 29 C.F.R. § 778.114(a).  To survive summary judgment on his IWPCA claim, on the other hand, Gallardo needs to prove that a genuine issue of fact exists regarding

whether he *and SBC* agreed to use a specific method of compensation. *See Zabinsky,* 347 Ill. App. 3d at 250; *Hess,* 668 F.3d at 452. Because there is no dispute that SBC intended to use the FWW method to compensate Gallardo, his IWPCA claim fails. *See Jaramillo,* 2012 WL 1378667, at *2 ("[T]he IWPCA merely demands that employers pay whatever wages were agreed to."); *Colgren,* 2000 WL 1154072, at *4 ("Just as the IWPCA does not mandate vacation pay, it does not mandate overtime pay, but merely requires that the employer pay its employees the wage it promised them."); *see also Lululemon Athletica,* 2011 WL 741254, at *3 ("It is well established that an employee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed.")

Accordingly, the Court grants SBC's motion for summary judgment with respect to Gallardo's IWPCA claim, but denies it with respect to Alvarado's IWPCA claim.

## II.     Plaintiffs' Motion to Send Class Notice

Plaintiffs move the Court for leave to send notice of this putative FLSA collective action to "similarly situated past and present employees who have worked for Defendants as landscapers or as drivers/landscapers at various locations serviced by Defendants, within the pertinent statutory time period." (Pls. Mot. for Class Notice ¶ 2.) Additionally, Plaintiffs seek Court approval of their proposed notice and consent form. (R. 50, Pls. Mem. re Class Notice at 9-10 & Ex. C.)

### A.     Legal Standard

Section 16(b) of the FLSA "gives employees the right to bring their FLSA claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez*

*v. City of Chicago,* 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b)).  An FLSA collective action is "similar to, but distinct from, the typical class action brought pursuant to Fed. R. Civ. P. 23."  *Id.*  The principle difference is "in a collective action unnamed plaintiffs need to opt in to be bound, rather than, as in a class action, opt out not to be bound."  *Epenscheid v. DirectSat USA, LLC,* 688 F.3d 872, 877 (7th Cir. 2012).

District courts have broad discretion in managing collective actions under the FLSA.  *See Alvarez,* 605 F.3d at 449.  This discretion includes, in appropriate cases, the authority to facilitate notice of the pending collective action to potential plaintiffs.  *See Hoffmann-LaRoche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S. Ct. 482, 197 L. Ed. 2d 480 (1989).  District courts may use a "conditional approval process . . . to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action."  *Ervin v. OS Restaurant Servs., Inc.,* 632 F.3d 971, 974 (7th Cir. 2011).

"The Seventh Circuit has not yet established criteria for determining whether employees are 'similarly situated' for purposes of the FLSA, but 'the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action.'"  *Strait v. Belcan Eng'g Grp., Inc.,* 911 F. Supp. 2d 709, 718 (N.D. Ill. 2012) (quoting *Franks v. MKM Oil, Inc.,* No. 10 CV 00013, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012)); *Camilotes v. Resurrection Health Care Corp.,* 286 F.R.D. 339, 345 (N.D. Ill. 2012) (same); *Brown v. Club Assist Road Serv. U.S., Inc.,* No. 12 CV 5710, 2013 WL 5304100, at *12 (N.D. Ill. Sept. 19, 2013) ("Courts generally take a two-step approach to conditional approval or certification of a federal collective action."); *Zavala v. Wal-Mart Stores Inc.,* 691 F.3d 527, 533 (3d Cir. 2012) (finding that a more stringent standard applies to final certification compared to

conditional certification); *Myers v. Hertz Corp.,* 624 F.3d 537,554-55 (2d Cir. 2010)

(recognizing that a two-step method is sensible).  The first step focuses on "determin[ing]

*whether* 'similarly situated' plaintiffs do in fact exist," and the second step focuses on "whether

the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."  *See*

*Myers,* 624 F.3d at 555; *Zavala,* 691 F.3d at 536 n.4.  The first-step standards apply to Plaintiffs'

motion to send notice to potential class members.

In the first step, "the court makes an initial determination to send notice to potential opt-

in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a

FLSA violation has occurred."  *Brown,* 2013 WL 5304100, at *12 (citing *Myers,* 624 F.3d at

555).  The named plaintiffs "can show that the potential claimants are similarly situated by

making a modest factual showing sufficient to demonstrate that they and potential plaintiffs

together were victims of a common policy or plan that violated the law."  *Strait,* 911 F. Supp. 2d

at 718 (quoting *Franks,* 2012 WL 3903782, at *10); *Camilotes,* 286 F.R.D. 339 at 345 (same).

This "modest factual showing" requirement sets a "low standard of proof."  *Bergman v. Kindred*

*Healthcare, Inc.,* --- F. Supp. 2d ----, 2013 WL 2632596, at *3 (N.D. Ill. June 11, 2013); *see also*

*Jirak v. Abbott Labs., Inc.,* 566 F. Supp. 2d 845, 847-48 (N.D. Ill. 2008) ("In the first step,

Plaintiffs only need to make a minimal showing that others in the potential class are similarly

situated." (internal quotations and citation omitted)).  Plaintiffs cannot satisfy this burden,

however, through "unsupported assertions" alone; they must put forward "some evidence,

beyond pure speculation, of a factual nexus between the manner in which the employer's alleged

policy affected her and the manner in which it affected other employees."  *Brown,* 2013 WL

5305100, at *13 (quoting *Zavala,* 691 F.3d at 536 n.4); *see also Molina v. First Line Solutions*

*LLC,* 566 F. Supp. 2d 770, 786 (N.D. Ill. 2007).  Once the plaintiffs satisfy their initial burden, the court may allow them to issue notice to prospective plaintiffs who may opt into the action. *See Bergman,* 2013 WL 2632596, at *3; *Brown,* 2013 WL 5304100, at *12.

After discovery closes and the named plaintiffs identify the opt-in plaintiffs, the case moves to the second step in the process, at which point the court's inquiry becomes more stringent.  *Franks,* 2012 WL 3903782, at *10 (citing *Jirak,* 566 F. Supp. 2d at 848); *see also AON Corp. Wage & Hour Employment Practices Litig.,* No. 08 C 5802, 2010 WL 1433314, at *5 (N.D. Ill. Apr. 8, 2010).  In the second step, the court determines "whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs."  *Myers,* 624 F.3d at 555; *see also Zavala,* 691 F.3d at 536 n.4 (same).  In making this determination, the court considers: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns."  *Strait,* 911 F. Supp. 2d at 718 (quoting *Franks,* 2012 WL 3903782, at *10).  This stage is where the certification becomes more akin to the familiar Rule 23 class certification standard . . . ."  *Brown,* 2013 WL 5304100, at *12 (citing *Espenscheid,* 705 F.3d at 772).

### B.    Unpaid Travel Time

"[A]n FLSA plaintiff that cannot withstand summary judgment "may not assert a claim under the FLSA for 'similarly situated' employees."  *Lance v. Scotts Co.,* No. 04 5270, 2005 WL 1785315, at *8 (N.D. Ill. July 21, 2005) (citations omitted); *see also Mullins v. Target Corp.,* No. 09 C 7573, 2011 WL 1399262, at *9 (N.D. Ill. Apr. 13, 2011) ("In light of our ruling granting summary judgment in favor or Target, plaintiff's motion for conditional certification of a FLSA

collective action and for notice to issue is denied as moot . . . .").  Accordingly, in light of the Court's ruling on Defendants' motion for partial summary judgment with respect to Plaintiffs' unpaid travel time claims, the Court denies Plaintiffs' motion to send notice to potential class members regarding these claims.

### C.      Improper Calculation of Overtime Pay

Plaintiffs argue that SBC's use of the FWW method to compensate all site supervisors is a "common practice or policy" sufficient to warrant sending notice to all other employees who SBC similarly compensated using the FWW method.  (*See* Pls. Mem. re Class Notice at 3.)  The Court disagrees.  Plaintiffs have not demonstrated that SBC paid site supervisors less than the FWW method requires.  Rather, Plaintiffs' claim that SBC improperly used the FWW method to calculate Gallardo and Alvarado's compensation because they did not have a "clear understanding" that their base salary compensated them (apart from overtime premiums) for all hours worked, regardless of the number, not just for a 40-hour workweek.  (*See* Part I.E.2., *supra.*)  Plaintiffs have not offered any evidence that any SBC employees other than Gallardo and Alvarado also lacked this required "clear understanding."  Accordingly, Plaintiffs have failed to meet their burden of making a "modest factual showing" that other similarly situated plaintiffs exist.  *See Franks,* 2012 WL 3903782, at *10.

### D.      "Off-the-Clock" Work

Plaintiffs argue that SBC violated the FLSA by failing to compensate laborers for work they performed at SBC's main facility before leaving for the first client work site of the day or after returning from the last client work site of the day.  These activities included loading and unloading equipment and flowers from SBC trucks, unhitching the trailer from the truck,

refueling the truck, or disposing of garbage. (*See* R. 71, Pls. Reply Br. at 9-10.) Plaintiffs allege that SBC had an "unofficial policy" of allowing the site supervisors to choose one laborer to clock in and assist with these tasks, but as a practical matter, several laborers often helped even though they were "off-the-clock" and, thus, not compensated for this work. Plaintiffs claim that SBC management was aware of this practice and often observed first-hand laborers performing off-the-clock work. (*See id.* at 10.)

In support of their motion to send class notice, Plaintiffs cite deposition testimony from Gallardo and Alvarado and opt-in plaintiff Miguel Duran's discovery responses to demonstrate that additional "similarly situated" plaintiffs exist. Gallardo testified that "[e]very day" laborers on his crew—other than the one laborer he chose to clock-in and assist him—would help load the SBC trucks and take care of any broken equipment for 10-20 minutes before their shifts, and SBC did not compensate them for this work. (*See* Gallardo Dep. at 37:24-39:2.) Gallardo testified that laborers also performed post-shift work without compensation approximately twice a week. (*Id.* at 47:14- 49:8.) Alvarado similarly testified that members of his crew would work "off-the-clock" without compensation and that SBC management was aware of this. (*See* Alvarado Dep. at 85:17-89:4.) Furthermore, Duran stated in his discovery responses that "[t]he Plaintiffs regularly worked in the mornings prior to leaving the shop and upon return. I personally observed others working with me under the conditions described. The supervisors also observed employee crews engaged in work in the mornings prior to leaving the shop." (*See* R. 66-1, Duran's Interrogatory Resp. at ¶ 8.) This evidence, in total, is sufficient to meet Plaintiffs' burden of making a "modest factual showing" that "similarly situated" plaintiffs exist.

Defendants argue that Plaintiffs have not put forward sufficient evidence of other "similarly situated" laborers because they have no evidence that SBC management "directed *other* Laborers to work off-the-clock." (*See* R. 54, Defs. Resp. Br. at 11 (emphasis in original).) At this stage, Plaintiffs simply need to show that other potential plaintiffs "were victims of a common policy or plan that violated the law." *See, e.g., Franks,* 2012 WL 3903782, at *10. Plaintiffs have put forward sufficient evidence of other laborers performing "off-the-clock" work for which SBC did not compensate them. Whether Plaintiffs can carry their burden of showing that an FLSA collective action is an appropriate mechanism for resolving these claims is an issue for another day.[9]

Accordingly, the Court grants Plaintiffs' motion to send notice of their FLSA claims for "off-the-clock" work to potential class members. The Court, however, denies approval of Plaintiffs' proposed notice form because it assumed that the Court would permit Plaintiffs to send notice of all FLSA claims, not just the "off-the-clock" work claims. The parties shall meet and confer about an appropriate form of notice and consent and jointly submit new proposed notice and consent forms to the Court by January 24, 2014. Furthermore, because Plaintiffs have not demonstrated the existence of "similarly situated" employees outside the property improvement division, the Court limits notice to only employees who worked in the property improvement division. Finally, to facilitate noticing potential class members, the Court orders Defendants to produce by January 24, 2014 the names and last-known addresses of past and

---

[9] Additionally, Plaintiffs have offered evidence that SBC management was aware that laborers were performing "off-the-clock" work without compensation. (*See* Gallardo Dep. at 41:13-42:3; 44:4-18; Alvarado Dep. at 85:17-89:4.)

present SBC employees who worked as laborers in SBC's property improvement division within the statutory period.

**CONCLUSION**

For the reasons explained above, the Court grants Defendants' motion for partial summary judgment with respect to Gonzalez's and Duran's claims for unpaid travel time; denies Defendants' motion with respect to Gallardo's and Alvarado's claims under the FLSA and the IMWL; and grants Defendants' motion for summary judgment on Plaintiffs' IWPCA claims with respect to Gonzalez and Gallardo but denies it with respect with respect to Alvarado. Additionally, the Court denies Plaintiffs' amended motion to send notice to potential class members with respect to Plaintiffs' FLSA claims for unpaid travel time and improper use of the FWW method to calculate their overtime. The Court grants Plaintiffs' motion to send notice with respect to Plaintiffs' claims for compensation for "off-the-clock" work. The parties shall submit a proposed joint notice to the Court for approval by January 24, 2014. Additionally, by January 24, 2014, Defendants shall produce to Plaintiffs the names and last-known addresses of past and present SBC employees who worked as laborers in SBC's property improvement division within the statutory period.

**DATED:  January 14, 2014**                                  **ENTERED**

_____
AMY J. ST. EVE
U.S. District Court Judge